IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 6, 2007

## STATE OF TENNESSEE v. CURTIS DANIEL HART

**Appeal from the Circuit Court for Tipton County**
**No. 5207    Joseph H. Walker III, Judge**

---

**No. W2006-01332-CCA-R3-CD  - Filed August 9, 2007**

---

The Appellant, Curtis Daniel Hart, was found guilty by a Tipton County jury of second degree murder, simple possession of Alprazolam, a Schedule IV controlled substance, and simple possession of marijuana.  He was sentenced as a Range II offender to thirty-five years for second-degree murder and to eleven months and twenty-nine days for each simple possession conviction. All sentences were ordered to run concurrently for an effective sentence of thirty-five years.  On appeal, Hart raises the following issues regarding his conviction for second-degree murder: (1) whether the trial court erred in denying the motion to suppress his statement; and (2) whether the evidence is sufficient to support his conviction, in light of the evidence presented that he acted in self-defense.  After review, we find no error and affirm the judgment of conviction.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Gary F. Antrican, District Public Defender, Somerville, Tennessee, for the Appellant, Curtis Daniel Hart.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Mike Dunavant, District Attorney General; and James Walter Freeland, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On the morning of August 8, 2005, the forty-nine-year-old victim, Barry Crane, was found murdered at his residence in Tipton County.  Although the victim shared his home with his son, Scottie Crane, his daughter, Miranda, and her small child, none of the victim's family were at home on the night of the homicide.  Instead, the victim was discovered by his next door neighbor, Marvin

Fletcher. Fletcher found the victim, who had sustained two gunshot wounds to the back of his head, laying on the floor with his legs crossed. The victim held a muzzle loader rifle, and a pool of blood was beside his head. The investigation was initially treated as a possible suicide, but TBI Special Agent Donna Turner investigated the crime scene and determined that the body had been moved and "positioned" after being shot. An inventory of the house by Scottie Crane revealed that a .9mm Taurus semi-automatic pistol and a "SKS" Chinese assault rifle were missing.

Tipton County Sheriff's deputies began routinely interviewing all of the neighbors in the immediate area. One of the first interviews conducted was of the Appellant, who lived across the street from the victim with Adam and Rachael Thomas. The Appellant told the deputies that he had visited with the victim the night before the victim's death, but he stated he had left around 7:00 p.m. He also advised the deputies that he had seen a small car drive by the victim's house, return, drive up the victim's driveway, pull out, and drive off around 9:30 p.m.

Later that day, while officers were still at the scene, the Appellant summoned a deputy into his yard and showed the deputy an "SKS" assault rifle, which the Appellant stated he had found near Thomas' mailbox. The Appellant gave a written statement to an investigator and stated, "I want to make sure that everyone knows that I did not kill [the victim]. I had nothing to do with him dying." The Appellant did, however, admit that he had sold the victim twenty Xanax pills for $90.00 on the afternoon of August 7th.

On the night of August 8th, however, the Appellant confided in the Thomases that he shot the victim. He explained to them that the victim had been drinking and began going through the house gathering guns. The Appellant said "he felt trapped . . . it happened so fast that he just shot him, because he got cut and he felt threatened." Mr. Thomas recalled, at the time he related this information, the Appellant had only a "small scratch above his eyebrow." At trial, Thomas examined a photograph of the Appellant taken by investigators and commented that the cut in the photograph looked deeper than it had on August 8.

On August 9, 2005, the Appellant contacted his former employer and showed him an abrasion on his forehead. The Appellant stated, "[t]hat's where a guy held a knife to me, and I popped him twice in the chest." The Appellant's former employer then called the Sheriff's Department and reported the conversation. As a result, Agent Turner returned to the Appellant's residence to re-interview the Appellant later that day. Prior to the interview, the Appellant was searched, and a small amount of marijuana and a number of Xanax pills were recovered from his person. During this interview, the Appellant admitted to shooting the victim with the .9mm pistol and to disposing of the handgun by dumping it in a garbage can at a nearby Circle K store.[1]

The Appellant provided Agent Turner with the following statement:

---

[1]Efforts to retrieve the handgun at the identified Circle K store were unsuccessful.

I want to do the right thing and get this straight. I shot and killed [the victim]. I want to take responsibility for my actions. It is the right thing to do. I was led by the Lord to tell the truth on what happened.

. . . .

On Saturday night [August 6, 2005] I was playing poker at [the victim's] house. . . .

During the game I pulled out a bottle which contained Xanax. I used to have a prescription, but I get these off the street. I broke one bar off and [the victim] asked what it was. I told [him] that it was Xanax. [He] said he needed some for a sick friend.

I asked him how many he wanted, and he asked how much are they. I told him four dollars apiece or four fifty delivered. [The victim] handed me a hundred dollar bill and told me to take care of it. . . .

. . . .

On Sunday morning . . . I took [the victim] 20 Xanax and a $10 bill. They were in a cigarette cellophane package. . . .

. . . .

I was there about . . . an hour and a half. . . . I left and went back down to my house. I went to bed between 9:45 and ten o'clock p.m. I couldn't go to sleep. . . . I remembered I had left my glasses up there at the house.

I walked to the house, and [the victim] was sitting at the table on the carport. [The victim] was drinking. [He] took a couple shots of Seagram Seven . . . .

We walked in the kitchen, and [the victim] poured him a shot. [The victim] drank it, and he said, 'Let me show you what I have.'

. . . .

. . . When I walked in the living room, [the victim] had at least four rifles leaned against the cushions on the couch nearest the front door. . . .

[The victim] said . . . 'Come on and let's go get us a shot.'

We walked back into the kitchen. [The victim] pulled a pistol out of his front pocket. [The victim] was wearing bib overalls. [The victim] laid the pistol on the kitchen table. . . .

[The victim] poured two shots. I told him I didn't want a shot. [The victim] was getting a little mouthy and talking smack. He drank both shots. [The victim's] whole demeanor changed. [The victim] looked at me and said 'You think you are the baddest thing walking.'

I asked him what that was – where that was coming from. I was ready to leave the house. I took a step to the left. [The victim] kind of hemmed me up against the table and pulled a knife out of his back pocket. It looked like it was a butterfly knife. [The victim] stuck it to my forehead and told me he could cut my face off.

[The victim's] belly had me pinned against the table. I took my arms and swept [the victim's] arms to get the knife away from my head. The knife came out of his hands. I don't know where it landed.

I reached and got the pistol off the kitchen table. I picked it up with my right hand, and I shot him. [The victim] staggered a few feet, and I shot him again.

The first time I shot, I don't know if I hit him or not. I was standing between the kitchen and living room area. [The victim] started staggering where the guns were and looked to me a little incoherent. He looked like he was going down on his knees.

I stepped into the living room. That's when I shot the second time. The second shot was at a downward angle. I shot him the second time because I wasn't sure I had hit him the first time.

[The victim] fell down right in front of the couch. He was like lying on his side. I didn't see any blood on [the victim]. I didn't walk up on him. I did not touch [the victim] at all. I did not roll him over. I never got within three or four feet of [the victim] after I shot him.

. . . .

I did not check [the victim] to see if he was dead. He never said anything after I shot him. I was not arguing with [the victim] when I shot him. It was like an ego thing with him. It made [the victim] mad when I wouldn't take the shot of whiskey.

. . . [The victim] was just a nice guy, but that night he had totally changed. When [the victim] stuck that knife to my head, he scared me. I reacted the only way I knew to survive.

. . . When I got to my house, I went in and had the pistol in my shorts pocket.  I sat down in the chair.  I ate three Xanax and went to sleep. . . .

The postmortem examination revealed two gunshot wounds to the head, each of which would have proved fatal.  One gunshot entered the middle of the back of the victim's head and exited in front of the left ear.  The other gunshot wound entered the left side of the victim's back, a little below the nape of his neck and exited in front of the left ear.  The victim's blood alcohol content was 0.16 percent.

On November 7, 2005, a Tipton County grand jury returned a three-count indictment against the Appellant, charging him with:  (1) second-degree murder; (2) possession of Alprazolam, a Schedule IV controlled substance, with intent to deliver; and (3) simple possession of marijuana.  The Appellant filed a motion to suppress the statement he gave to Special Agent Turner on August 9, 2005, but, after a hearing, the motion was denied.  At trial, the Appellant did not testify but relied on his statement as evidence that he had shot the victim in self-defense.  The jury rejected the Appellant's argument and found him guilty of second-degree murder.  The jury also found the Appellant guilty of simple possession of Alprazolam and simple possession of marijuana, but the Appellant does not challenge those misdemeanor convictions on appeal.  The Appellant was sentenced to thirty-five years, as a multiple offender, for second-degree murder, and his misdemeanor sentences were ordered to run concurrently, resulting in an effective sentence of thirty-five years.  Following the denial of his motion for new trial, the Appellant filed the instant timely appeal.

**Analysis**

**I.      Motion to Suppress**

The Appellant argues that the trial court should have suppressed the statement he gave to Special Agent Turner on August 9, 2005, because "it was obtained in violation of [his] rights under the Fifth Amendment to the United States Constitution and [a]rticle I[,] section 9 of the Tennessee Constitution."  He asserts that he was "under the influence of a narcotic at the time" the statement was given as evidenced by the fact that "[i]n his statement to [Special Agent Turner] he said he had taken three Xanax the night before . . . sometime after 10:00 p.m." and another Xanax pill, around 8:00 a.m., on the morning of the interview.[2]  The Appellant's involuntariness claim is two-fold.  First, he argues that the waiver of his Fifth Amendment protections against self-incrimination was not voluntary.  Second, he contends that his statement was not freely and voluntarily given because

---

[2]The Appellant's argument with regard to the time frame of when he allegedly ingested three of the four Xanax pills is misleading.  The Appellant's brief asserts that he had consumed four Xanax, "three Xanax the night before . . . sometime after 10:00 p.m." and another "around 8:00 a.m. on the morning of the interview."  It is undisputed that the interview occurred on the afternoon of August 9.  The Appellant's statement to Agent Turner that he took "three Xanax the night before . . . sometime around 10:00 p.m.," however, refers to the night of the murder on August 7th, not the night before the interview.

he was under the influence of Xanax. The State counters that there is no evidence that the Appellant's faculties were impaired and that his statement is constitutionally sound.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. Questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trial court as the trier of fact. *Id*. The prevailing party in the trial court is afforded the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000). However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of law to the facts found by the trial court is a question of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

As a prerequisite to the admissibility of a defendant's statement, the State must prove that the statement was voluntarily given by a defendant who had been advised of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

With regard to the question of whether the Appellant's statement was not a voluntary one because he had taken a Xanax pill that morning, the law in this state is well-established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000) (quoting *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980), *cert*. *denied*, 454 U.S. 1096, 102 S. Ct. 667 (1981)). A defendant's statement should be suppressed only when his faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect. *Id*. (citations omitted). The test to be applied "is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." *Id*. (citation omitted); *see also State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985) ("intoxication or mental unsoundness is not alone sufficient to bar the introduction of statements made by an accused if the evidence also shows the accused was capable of understanding his rights"); *State v. Lowe*, 584 S.W.2d 239, 241 (Tenn. Crim. App. 1979) (the blood alcohol content of the accused is merely a factor for the trial court to consider in determining whether a confession was the product of a free mind and a rational intellect).

At the hearing on the Appellant's motion to suppress, Special Agent Turner was the only witness to testify. She testified that she was advised that the Appellant's former employer had contacted the TBI and reported that the Appellant said "he had killed his neighbor" and that he might harm himself. Around noon, she went to the victim's neighborhood and walked to the end of the Appellant's driveway. He came out of the house to talk to her, and another agent frisked him

because they were concerned that he might be armed. The agent removed some pills and a small bag that contained some plant material from the Appellant.

The Appellant was subsequently transported to the Tipton County Sheriff's Department. At 2:24 p.m., he reviewed a written waiver of his constitutional rights. He read the first line, which stated "[b]efore we ask you any questions, you must understand your constitutional rights," and Special Agent Turner read each of the constitutional rights to him, including his right to remain silent, and advised him that he was waiving those rights. The Appellant signed the form. At 2:30 p.m., he reviewed a form which asked if he understood that his statement was being given under oath and that his statement was the truth. He answered by writing "I do," and he signed his name.

Special Agent Turner testified that she showed the Appellant a photograph of six different guns, and the Appellant circled a gun and wrote "Looks like the type," to indicate what weapon he used in the shooting. He signed the page and wrote the date and time. The Appellant gave a detailed oral statement that, after being transcribed, produced six, single-spaced, typed pages. He read each paragraph and wrote his initials at the beginning, and at the end, of each paragraph. At 8:14 p.m., he signed an "Affidavit" which stated that the statement he gave was true. He wrote the number six on a blank on the form to indicate that his statement was six pages long. Agent Turner read him the following statement:

> At the time of the making of this statement, I am not under the influence of alcohol, drugs or any other type of intoxicant which would render me incapable of understanding the statement made by me.

He indicated to Turner that he was not under the influence of any intoxicant, and he signed his name and wrote the date and time.

The Appellant told Special Agent Turner that he did not have a prescription for Xanax, but that he usually took a one milligram pill at 8:00 a.m. and another at 2:30 p.m. He told her he had taken one pill on schedule that morning. At some point during the interview, he asked if he could have one of the Xanax that he had been carrying when he was searched. This request was denied.

Agent Turner testified that "[i]t was obvious to me [the Appellant] was not under the influence. He was speaking coherently to me. He was talking back and forth . . . he had no problem with anything that I did . . . ."

In this case, we have reviewed the record and find no proof that preponderates against the trial court's finding that the Appellant's statement should not be suppressed. Specifically, the evidence does not preponderate against a finding that the Appellant made a voluntary and knowing waiver of his Fifth Amendment right to remain silent and that he voluntarily gave his statement, despite his assertions that he had ingested a one milligram pill of Xanax that morning. The Appellant signed an "Affidavit" stating that he "[was] not under the influence of alcohol, drugs or any other type of intoxicant . . . ." Additionally, the Appellant was clearly capable of giving Agent

Turner a chronology of his activities during the last three days, which were very specific regarding dates and times, people he contacted and their conversations, and his actions. As noted, the Appellant did not testify, and Special Agent Turner's testimony was not contradicted. Moreover, no medical evidence was provided to establish that the ingestion of a one milligram Xanax pill taken at 8:00 a.m. would incapacitate or cause the person to still be intoxicated at 2:30 p.m. that afternoon. The Appellant is not entitled to relief on this issue.

## II.    Sufficiency of the Evidence

The Appellant challenges the sufficiency of the evidence supporting his conviction for second-degree murder. He asserts that "[a] rational trier of fact, even after looking at the evidence most favorably to the prosecution, could not find [the Appellant] guilty of second degree murder. This was clearly a case of self defense." The State asserts there is "overwhelming evidence in the record" to support the jury's determination that the Appellant was guilty of second-degree murder.

In considering the issue of sufficiency of the evidence, we apply the rule that where the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Question about witness credibility were resolved by the jury. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The Appellant was convicted of second degree murder, which is defined as the "knowing killing of another." T.C.A. § 39-13-210 (2006). A person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b) (2006). Additionally, it must be established that the killing was unlawful. T.C.A. § 39-13-201 (2006).

The Appellant's entire sufficiency argument centers around his claim of self-defense. He does not contest that he shot and killed the victim, but he asserts that he did so in self-defense after the victim cut him with a knife. Thus, he argues that the killing was legally justified.

Tennessee Code Annotated section 39-11-611(a) provides that:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

T.C.A. § 39-11-611(a) (2006). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the trier of fact. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury verdict, in order to prevail, the [Appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *Clifton*, 880 S.W.2d at 743. Moreover, the State has the burden of negating any defense if admissible evidence is introduced supporting the defense. T.C.A. § 39-11-201(a)(3). It is clearly within the prerogative of the jury to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The Appellant asserts the evidence of self-defense is so compelling that any rational juror must come to the inescapable conclusion that he was legally justified in shooting the victim. He notes that there were no witnesses in the victim's house at the time of the shooting and asserts that the only evidence of what happened "comes from [the] Appellant's statements." However, in his statement, the Appellant admits that he shot the victim twice, with the forensic proof establishing that both shots were fired to the back of the head. The Appellant also states that the victim attacked him with a "butterfly knife." However, the victim's son testified that the victim did not own such a knife. The Appellant, in his statement, relates that after he shot the victim the first time, the victim appeared "incoherent" and "going down on his knees." Thus, from the Appellant's statement, we glean that, although the victim was incapacitated, the Appellant shot the victim a second time. The Appellant states he "did not touch [the victim] at all"; however, the physical evidence at trial clearly contradicted this assertion. Evidence was introduced at trial from which a rational juror could have concluded that the Appellant's cut to his forehead was self-inflicted. Moreover, before giving the statement to the police, which the Appellant now relies upon, the Appellant had given two additional statements denying any involvement in the victim's death. Finally, the Appellant's actions of disposing of the murder weapon and not seeking medical assistance for the victim are not consistent with his claim of self-defense.

-9-

Whether the killing of one person by another occurs under circumstances which justify the act under the doctrine of self defense, or is the result of some other motive, is a question of fact to be determined by the jury under proper instructions and from consideration of all the evidence. The jury was not obligated to accept the Appellant's testimony as to self defense. The issue of self defense in a murder prosecution is always a question of fact to be determined by the trier of fact. In summary, there was ample evidence to support the jury's finding in this case that the Appellant "knowingly" killed the victim. This issue is without merit.

## CONCLUSION

We conclude that the proof does not preponderate against the trial court's finding that the Appellant's statement was voluntary. Moreover, we conclude that the evidence is legally sufficient to support the Appellant's conviction for second degree murder. Based on the foregoing, the judgment of the Tipton County Circuit Court is affirmed.

_____
DAVID G. HAYES, JUDGE

-10-